# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LO3 ENERGY, INC. | ) |
| | ) |
| Plaintiff, | ) **SUMMONS** |
| | ) |
| -against- | ) |
| | ) |
| VULCANIZE, INC, ARTHUR FREDERICK | ) |
| DUDLEY, and ADAM SCISLOWICZ, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Index No.: _____

To the Defendants Listed Below:

PLEASE TAKE NOTE THAT YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer on the Plaintiff's attorneys within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York). In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Venue is proper in New York County pursuant to CPLR § 503 because Vulcanize, Inc. has offices, and all Defendants transact business in, New York County, and the causes of action alleged herein arose in New York County. Alternatively, venue is proper in this Court under CPLR § 509 because New York County is the venue chosen by Plaintiff.

Dated: March 31, 2017
     New York, New York

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: *s/ Tonia Ouellette Klausner*
    Tonia Ouellette Klausner

1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

*Counsel for Plaintiff LO3 Energy, Inc.*

To:    Vulcanize, Inc.
       Arthur Frederick Dudley
       Adam Scislowicz

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LO3 ENERGY, INC. ) | Index No.: _____ |
| ) | |
| Plaintiff, ) | **VERIFIED COMPLAINT** |
| ) | |
| -against- ) | |
| ) | |
| VULCANIZE, INC, ARTHUR FREDERICK ) | |
| DUDLEY, and ADAM SCISLOWICZ, ) | |
| ) | |
| Defendants. ) | |

Plaintiff LO3 Energy, Inc. ("LO3 Energy", the "Company", or "Plaintiff"), by and through its attorneys, Wilson Sonsini Goodrich & Rosati, complains and alleges against Defendants Vulcanize, Inc. ("Vulcanize"), Arthur Fredrick "Rick" Dudley, and Adam Scislowicz as follows:

**THE PARTIES**

1.      Plaintiff LO3 Energy is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Brooklyn, New York.  LO3 Energy is an energy technology company that helps utility and energy retail customers clients create, deploy and monetize differentiated and compelling energy products and customer services in increasingly open and competitive electricity markets.

2.      Defendant Vulcanize is a corporation organized and existing under the laws of the state of Delaware, with its office in New York, New York.

3.      Vulcanize is a technology company that specializes in developing blockchain software technology for third parties on a consulting basis.

4. Defendant Arthur Frederick "Rick" Dudley is the CEO of Vulcanize. On information and belief, he resides in New York, New York.

5. Defendant Adam Scislowicz is a principal of Vulcanize. On information and belief, he resides in San Diego, California.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over Vulcanize because, pursuant to the Consulting Services Agreement (as defined below) with LO3 Energy, it expressly agreed that "[a]ny litigation relating to this Agreement shall be conducted exclusively in state or federal courts in New York, New York." This Court also has personal jurisdiction over all Defendants pursuant to CPLR § 301 in that the acts complained of took place in New York and the Defendants reside and/or regularly conduct business in New York.

7. Venue is proper in New York County pursuant to CPLR § 503 because Vulcanize has offices, and all Defendants transact business in, New York County, and the causes of action alleged herein arose in New York County. Alternatively, venue is proper in this Court under CPLR § 509 because New York County is the venue chosen by Plaintiff.

## FACTUAL ALLEGATIONS

### LO3 Energy Develops Innovative Infrastructure for Energy Industry

8. LO3Energy has developed a proprietary platform called the TransActive Grid ("TAG") platform that enables energy companies to conduct peer-to-peer energy transactions with both parties privy to the exact same information, potentially eliminating the need for energy intermediaries. The TAG platform also enables energy producers to sell directly to consumers, as well as allowing automated, economically-triggered, control of distributed energy resources for grid balancing, demand response, emergency management, and other uses.

2

9. The technology comprising the TAG platform is a combination of blockchain-based software solutions, supporting "smart" applications, and the computing hardware the blockchain network runs on.

10. "Blockchain" is an existing technology that serves as a digital ledger that simultaneously shares, updates, and distributes information without the need for a central storage facility, or ledger, for data. However, existing blockchain technology is too large to properly function on older or less sophisticated technology, including technology used in the energy grid.

11. LO3 Energy developed and designed an entirely new blockchain architecture for use in the TAG platform so that it can work on the energy grid and any other embedded device (e.g., "smart" thermostats and lights).

12. LO3 Energy has spent nearly two years and more than one million dollars investing in its proprietary and trade secret technology.

**LO3 Energy Contracts with Vulcanize and its Employees for Development Work**

13. LO3 Energy sought out the services of Vulcanize to assist in development work to build out the proprietary blockchain technology that LO3 Energy designed and architected.

14. Before disclosing any information concerning architecture and design to Vulcanize, LO3 Energy required Vulcanize's principals to sign nondisclosure agreements.

15. Specifically, in May 2015 and June 2016, LO3 Energy entered into Mutual Nondisclosure Agreements ("NDAs") with Vulcanize CEO Rick Dudley and Vulcanize's other principal Adam Scislowicz, regarding the parties' "desire to engage in discussions to examine certain potentially mutually beneficial projects between them … or potentially an ongoing business relationship." See Exhibits A & B at 1. The NDAs anticipated that "[i]n the course of such discussion each party … may have access to or have disclosed to it Confidential

3

Information … of the other party[.]" *Id.* at 1. The NDAs each required the parties thereto to "retain all Confidential Information and not to disclose any such information … and not to use any such information for (a) [their] own benefit or (b) to the Disclosing Party's detriment or for any purpose other than the purpose recited above." *Id.* at 2.

16.  LO3 Energy relied on those agreements in sharing with Mr. Dudley and Mr. Scislowicz details regarding their new design and architecture for a blockchain platform.

17.  Following the entry of the aforementioned NDAs, in August 2016, LO3 Energy entered a Consulting Services Agreement with Vulcanize ("Consulting Agreement") pursuant to which Vulcanize agreed to develop certain customized energy/embedded device-specific blockchain technology that LO3 Energy uses in its TAG platform. See Exhibit C ("Goal: To create a Proof of Concept ("POC") Proof of Stake ("POS") based smart contract executing network ("Blockchain") to run on proprietary hardware provided by Client ("Client Hardware")… Nodes on the Blockchain will be connected to the same electrical grid and to a private IP network for demonstration purposes.")

18.  The Consulting Agreement acknowledges that LO3 Energy's team "excels at the ideation, architecture, development, prototyping and testing of cutting edge distributed energy, computing and peer-to-peer distributed consensus networks for its customers."

19.  The Consulting Agreement specifies that LO3 Energy was retaining Vulcanize to create a "Proof of Concept/Proof of Stake" based smart contract executing network to run on proprietary hardware provided by LO3 Energy, described in more detail in an accompanying Scope of Work ("SOW").

4

20.    Under the SOW Vulcanized was responsible for, among other things, developing the Blockchain component for "POS Ethereum Virtual Machine ("EVM") network for transacting tokens." See Exhibit C at 5.

21.    Vulcanize further agree to "work with the hardware team to develop: (1) Smart contract Device Control[, and] (2) Oracle-based Device Control. See Exhibit C at 6.

22.    Section 5 of the Consulting Agreement made clear that "Subject to the provisions of the SOW, all writings, software, analyses and related documentation created by [Vulcanize] pursuant to this Agreement shall become the property of [LO3 Energy] and [Vulcanize] shall not copy or communicate any such documentation to any third party without the prior written consent of [LO3 Energy]." See Exhibit C at 5(b).

23.    Additionally, the Consulting Agreement contains provisions concerning confidentiality and proprietary rights that protect LO3 Energy's "Confidential Information" which is defined as information "that is disclosed by [LO3 Energy] to [Vulcanize] during the term of this Agreement, whether of a technical, business, or other nature (including, without limitation, writings, trade secrets, know-how and information relating to technology, business plans…". See Exhibit C at 5(a).

24.    The Consulting Agreement further provides that "Subject to the provisions of the SOW, any materials, ideas or expressions developed by [Vulcanize] in any medium during the course of performing Work under this Agreement that relate to the Work or any invention, discovery or intellectual property owned or controlled by [LO3 Energy] shall become the property of [LO3 Energy].  [Vulcanize] shall not retain any copies of the property owned by [LO3 Energy] without [LO3 Energy]'s prior written permission."

5

25.     The SOW addresses ownership of deliverables to LO3 Energy under the Consulting Agreement, and makes clear that Vulcanize will have ownership of only two features of the Blockchain component – the "Marketplace for buying and selling tokens," and the "Payment Oracles."

26.     Neither the "Marketplace for buying and selling tokens" nor the "Payment Oracles" features has been requested by or provided to LO3 as a deliverable.

27.     In early March 2017, after materially completing but prior to finalizing development of the blockchain technology that LO3 Energy designed and commissioned Vulcanize to build, Vulcanize suddenly and unexpectedly demanded that LO3 Energy enter into an amended Consulting Agreement ("Amended Consulting Agreement") if LO3 Energy wanted Vulcanize to finish developing the blockchain technology that LO3 Energy designed.

28.     Notably, the Amended Consulting Agreement contained a provision pursuant to which Vulcanize would take ownership from LO3 Energy of the blockchain technology that LO3 Energy designed and commissioned Vulcanize to build.

29.     LO3 Energy refused to sign the Amended Consulting Agreement and Zac Wheeler of LO3 Energy expressly told Vulcanize that LO3 Energy would not assign to Vulcanize ownership of the blockchain technology that LO3 Energy designed and commissioned Vulcanize to build.

30.     Notwithstanding LO3 Energy's refusal to assign ownership, Vulcanize has continued to develop the blockchain technology that LO3 Energy designed without LO3 Energy's permission and has expressly claimed that Vulcanize owns it, notwithstanding that LO3 Energy refused to sign the Amended Consulting Agreement.

6

31.     Moreover, Vulcanize has threatened to terminate its consulting relationship with LO3 Energy and not complete the work still due under the Consulting Agreement if LO3 Energy does not assign ownership to Vulcanize of the blockchain technology that LO3 Energy designed.

32.     On March 31, 2017, LO3 Energy attempted to discuss with Vulcanize its claim that it owns the blockchain technology that LO3 Energy designed.  Vulcanize claimed it was unavailable to speak.

33.     In response, LO3 Energy's legal counsel, Tonia Klausner, specifically requested assurances from Vulcanize that it would not disclose LO3 Energy's Trade Secret Information (as defined below), stating: "LO3 needs assurances from Vulcanize that it will not publicly release or otherwise share with any third party anything developed in connection with the parties' Consulting Agreement until the lawyers sort out who has rights to what.  Please confirm right away."

34.     Vulcanize did not respond and, on the same day, removed LO3 Energy's access rights to the database in which the code developed by Vulcanize for LO3 Energy is contained.

35.     On information and belief, Vulcanize intends to use and disclose the code it developed for LO3 Energy using LO3 Energy's Trade Secret Information (as defined below) in a competing platform, and offer the underlying code for free to the public as "open source".

**The Proprietary and Confidential Information Provided by LO3 Energy to Vulcanize Is Trade Secret Information**

36.     The architecture and design of the blockchain technology used in LO3 Energy's TAG platform, and its application to the energy industry and other embedded devices, is completely novel and valuable trade secret information, and LO3 Energy has spent substantial time, effort, and resources developing it.  Accordingly, LO3 Energy possesses highly

7

confidential, proprietary, and trade secret information not only about its technology, but also about its industry focus, potential customers, and strategy relating to its solutions. This includes extremely valuable proprietary blockchain software architecture, strategic plans, product development information, and marketing plans. All information described in this paragraph collectively "Trade Secret Information".

37.     LO3 Energy makes reasonable efforts to maintain the secrecy of its Trade Secret Information, including, but not limited to, instructing LO3 Energy's employees on the importance of maintaining the confidentiality of its Trade Secret Information, restricting employee access to Trade Secret Information, requiring its employees to sign agreements obligating them to maintain the confidentiality of Trade Secret Information, requiring certain employees to agree not to compete with LO3 Energy or solicit its employees for a certain period after their employment with LO3 Energy ends, and restricting access of visitors and other members of the public to LO3 Energy's Trade Secret Information.

38.     LO3 Energy further protects its Trade Secret Information by requiring third parties to sign Non-Disclosure Agreements before discussing it.

39.     LO3 Energy required Vulcanize and its principal employees to enter into nondisclosure agreements related to its disclosure of the Trade Secret Information to Vulcanize.

40.     LO3 Energy's Trade Secret Information serves to create a competitive advantage for LO3 Energy and is valuable because it is unknown by others. If a competitor obtained the Trade Secret Information, the competitor would, gain an unlawful and unfair advantage and benefit, since it would have the benefit of this information without investing the significant time and effort expended by LO3 Energy. Alternatively, even if the Trade Secret

8

Information was used by a non-competitive entity, such entity would be unjustly enriched by the fruit of LO3 Energy's labor.

41.     In the course of working with Vulcanize to enable it to perform the agreed-upon work under the Consulting Agreement, an in reliance upon Vulcanize's duty not to disclose such information, LO3 Energy shared its Trade Secret Information with Vulcanize.

42.     The work product produced by Vulcanize pursuant to the Consulting Agreement incorporates Trade Secret Information and brings to fruition the novel and proprietary blockchain technology that LO3 Energy designed for exclusive use in its TAG platform.

**Vulcanize is Threatening to Disclose LO3 Energy's Trade Secret Information and Breach the Consulting Agreement**

43.     On or around March 22, 2017, Defendant Dudley claimed to Zach Wheeler at LO3 Energy that Vulcanize owns the deliverables it has provided to LO3 Energy, including the blockchain technology that it created based on the architecture provided by LO3 Energy and other Trade Secret Information.

44.     Defendant Dudley further indicated to Mr. Wheeler that Vulcanize plans on selling to other customers materials portions, if not all, of the code it created for LO3 Energy's proprietary blockchain design and product.  Defendant Dudley claimed that the blockchain code it developed for LO3 Energy should be open-source (i.e., free to the public).

45.     Defendant Dudley's statement further threatens to breach the confidentiality and non-disclosure as well as the ownership portions of the Consulting Agreement.

46.     Notably, Vulcanize further began advertising the blockchain work product that it created for LO3 Energy as "VulcanizeDB" on Youtube in its description of Vulcanize's services available to its clients and which Defendant Dudley noted by e-mail to Mr. Wheeler was "open source" and would imminently be publicly disclosed.

9

47.     In addition, as noted above, Vulcanize suddenly demanded in early March 2017 that LO3 Energy enter into the Amended Consulting Agreement pursuant to which LO3 Energy would assign ownership to Vulcanize of the blockchain technology that LO3 Energy designed.

48.     Also, as noted above, Vulcanize has refused to provide LO3 Energy assurances that it will not disclose the blockchain technology that LO3 Energy designed, and it has blocked LO3 Energy from any access to the blockchain technology that LO3 Energy designed.

**Threat of Irreparable Harm**

49.     Vulcanize's threatened disclosure of the Trade Secret Information will significantly impair the value of the TAG platform and the proprietary nature thereof.  LO3 Energy's business would likely suffer significant non-monetary harm with the disclosure in a public forum of code that would give away for free the valuable architecture, design, and other detailed information about how its proprietary TAG platform works.

50.     The harm caused by Vulcanize's conduct, as acknowledged in the Consulting Agreement, is difficult to quantify and cannot be remedied by monetary damages. Accordingly, LO3 Energy is seeking injunctive relief to prevent the disclosure of its Trade Secret Information.  See Exhibit C at 3 ("[Vulcanize] agrees that [LO3 Energy] would be irreparably harmed by [Vulcanize's] breach of the [confidentiality provisions of the Agreement].")

### FIRST CAUSE OF ACTION
**Breach of Written Contract**

51.     Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

52.     The Consulting Agreement and NDAs are valid and binding contract between LO3 Energy and Defendants for the development of the TAG platform and the sharing of

10

confidential information, and are reasonable and necessary to protect Plaintiff's Trade Secret Information.

53.     Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Consulting Agreement and NDAs, or was excused from performing all of its obligations under such contracts.

54.     The Consulting Agreement and NDAs are reasonable and necessary to protect Plaintiff's Trade Secret Information.

55.     Defendants have unjustifiably and inexcusably breached and threatened to breach their obligations under the Consulting Agreement and NDAs by the conduct described above and by threatening to publicly disclose LO3 Energy's confidential information.

56.     LO3 Energy will be irreparably harmed by Defendants' breach of the Consulting Agreement and NDAs, since any such disclosure would irreparably harm LO3 Energy's competitive market position.

## SECOND CAUSE OF ACTION
### Trade Secret Misappropriation

57.     Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

58.     Plaintiff's Trade Secret Information has independent economic value from not being generally known to the public and has provided Plaintiff with a legitimate commercial advantage over their actual and would-be competitors. Plaintiff has made, and continues to make, diligent efforts to protect the Trade Secret Information. Accordingly, the Trade Secret Information constitutes "trade secrets," under New York law.

59.     Defendants were and are under a common law and contractual duty to both keep Plaintiff's Trade Secret Information confidential, and not to use or disclose such information.

11

60.     Defendants have expressly threatened to use and publicly disclose Plaintiff's Trade Secret Information and have done so with knowledge. Defendants' use or disclosure of Plaintiff's Trade Secret Information has been and will continue to be direct violation of its contractual obligations to Plaintiff and New York law.

61.     Defendants have threatened to willfully and maliciously misappropriate and/or wrongfully use Plaintiff's Trade Secret Information as described above, for purposes of personal gain and/or gaining a competitive advantage over Plaintiff.

62.     Upon information and belief, the Defendants have gained, or will gain, substantial benefit from its use and disclosure of Plaintiff's trade secrets to Plaintiff's substantial detriment.

63.     As a result of Defendants' said unlawful conduct, Plaintiff's Trade Secret Information has been threatened and/or compromised.

64.     Unless enjoined by this Court, Defendants' threatened conduct will cause irreparable injury to Plaintiff, and Plaintiff have no adequate or other remedy at law for such acts and threatened acts.

### THIRD CAUSE OF ACTION
### Misappropriation of Ideas

65.     Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

66.     There is a legal relationship between Plaintiff and Defendants in the form of an express contract.

67.     Plaintiff's Trade Secret Information, including its architectural design for the blockchain technology to be used in its TAG platform, is novel and concrete.

68.     Defendants are threatening to disclosed the Trade Secret Information to the general public.

69.     Unless enjoined by this Court, Defendants' threatened conduct will cause great and irreparable injury to Plaintiff, and Plaintiff have no adequate or other remedy at law for such acts and threatened acts.

12

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in its favor and against Defendants as follows:

1.    For injunctive relief in the nature of a temporary, preliminary and permanent injunction under which Defendants and all those acting in concert with them, including but not limited to all of Defendants' officers, employees, and agents, be enjoined from:

      a.    Using any information received from Plaintiff in connection with the Consulting Services Agreement and/or Nondisclosure Agreements between the parties for any purpose other than to complete the contracted-for development work pursuant to those Agreements;

      b.    Publicly disclosing any work product developed in connection with the Consulting Services Agreement and/or Nondisclosure Agreements, including but not limited to posting any code, tools, or other work product on any open source website or database; and

      c.    Distributing or providing third parties access to (i) any information received from Plaintiff in connection with the Consulting Services Agreement and/or Nondisclosure Agreements, or (ii) any work product developed using such information.

2.    Costs of litigation, court fees, and reasonable attorneys' fees pursuant to the terms of the Consulting Agreement; and

3.    Such other and further relief as the Court deems just and proper.

Dated: March 31, 2017

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____
Tonia Ouellette Klausner

Tonia Ouellette Klausner
Gerard D. O'Shea
Jason Mollick
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: 212-999-5800
Facsimile: 212-999-5899

*Attorneys for Plaintiff LO3 Energy, Inc.*

14

## VERIFICATION

STATE OF NEW YORK    )
                           ) ss.:

COUNTY OF KINGS      )

      Lawrence Orsini duly affirms and says:

1.     I am Chief Executive Officer of LO3 Energy, Inc., the Plaintiff in this action.

1.     I have read the foregoing Verified Complaint and know the contents thereof. The same is true to be the best of my knowledge, except as to those matters therein which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

Dated: March 31, 2017

_____
Lawrence Orsini

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 03/31/2017 01:52 PM
NYSCEF DOC. NO.

INDEX NO. 651743/2017

RECEIVED NYSCEF: 03/31/2017

Case 1:17-cv-02788-ALC   Document 1-1   Filed 04/18/17   Page 19 of 37

MUTUAL NONDISCLOSURE AGREEMENT

THIS MUTUAL NONDISCLOSURE AGREEMENT (this "**Agreement**") is dated May 01, 2015 (the "**Effective Date**") by and between LO3 Energy and Arthur Frederick Dudley

BACKGROUND

A.      LO3 Energy  and Arthur Frederick Dudley desire to engage in discussions to examine certain potential mutually beneficial projects between them ("**Potential Projects**") or potentially an ongoing business relationship;

B.      In the course of such discussions each party (the "**Receiving Party**") may have access to or have disclosed to it Confidential Information (as defined in Section 1 below) of the other party (the "**Disclosing Party**"); and

C.      LO3 Energy  and Arthur Frederick Dudley each desire to establish and set forth their mutual obligations with respect to such Confidential Information.

AGREEMENT

For good and valuable consideration acknowledged here, the parties agree as follows:

1.  Confidential Information.      For the purposes of this Agreement "**Confidential Information**" means all information which Receiving Party and any director, officer, employee, agent, affiliate, subsidiary, representative, consultant, member, contractor, advisor or attorney (each, an "**Agent**") receives at any time from the Disclosing Party or any of its Agents whether the information is received verbally, in writing, visually, by inspection of documents, products or processes, by electronic transmission, or in any other form or manner.   All such information that is considered by both parties to be Confidential Information shall be clearly marked as such.   Information that is disclosed verbally shall be considered Confidential information if within sixty (60) days of initial disclosure, the Disclosing Party confirms in writing delivered to the Receiving Party the confidential nature of such verbally disclosed information. Such writing shall be sufficiently specific to enable the Receiving Party to identify the information the Disclosing Party considers to be confidential.   Confidential Information also includes the following:  (a) all data (including, but not limited to, critical infrastructure information); (b) materials; (c) products; (d) client or customer information; (e) business plans; (f) compilations; (g) evaluations; (h) analyses; (i) financial information; (j) software programs or databases; (k) technical, administrative or marketing know-how; (l) services or pricing estimates, quotations or similar information; or (m) other information developed or prepared by the Disclosing Party or its Agents.   However, information that (w) becomes generally available to the public other than as a result of disclosure by the Receiving Party or by the Receiving Party's representatives, (x) was available to the Receiving Party on a non-confidential basis prior to its disclosure to the Receiving Party by the Disclosing Party or its Agents, (y) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party or its Agents when such source is entitled, to the best of the Receiving Party's knowledge, to make disclosure to the Receiving Party, or (z) was developed by the Receiving Party or its Agents independently without reference to or the benefit of the Disclosing Party's Confidential Information disclosed under this Agreement, is not Confidential Information

2. <u>Nondisclosure.</u> Receiving Party agrees to retain all Confidential Information and not to disclose any such information to any individual, group of individuals, partnership, corporation, limited liability company or other entity, public or private, including governmental bodies (each, a **"Person"**) and not to use any such information for (a) its own benefit or (b) to the Disclosing Party's detriment or for any purpose other than the purpose recited above. The Receiving Party further agrees that it shall not publish or disclose any Confidential Information to any third party and that it shall use its best efforts to prevent inadvertent disclosure of such Confidential Information to any third party. The Receiving Party agrees to use the same degree of care to protect the Confidential Information as it uses to protect its own confidential and proprietary information, but in no event less than a reasonable degree of care. Notwithstanding the provisions above, Receiving Party may disclose Confidential Information to its Agents only to the limited extent necessary to explore, establish, develop and/or maintain the Potential Projects, the business relationship or proposed business relationship with the Disclosing Party, *provided, however*, that: (x) Receiving Party shall deliver a copy of this Agreement to each Agent before any Confidential Information is disclosed to such Agent; (y) Receiving Party shall require each such Agent acknowledge that it, he or she has (1) read this Agreement and (2) agrees to maintain the disclosed information in confidence or the Receiving Party certifies in writing to the Disclosing Party that such Agents have previously agreed by contract, as a condition to employment or in order to obtain the Confidential Information, to be bound by terms and conditions substantially similar to those of this Agreement; and (z) Receiving Party shall be fully responsible for any use and disclosure of Confidential Information by any of its Agents in violation of this Agreement.

3. <u>No Copying; Return.</u> Receiving Party and any of its Agents shall not copy any Confidential Information without the prior written consent of the Disclosing Party. Upon request of the Disclosing Party, Receiving Party and its Agents shall immediately return to the Disclosing Party all documents, notes and other materials, including all copies thereof, constituting or containing any Confidential Information. In addition, upon request of the Disclosing Party, Receiving Party and its Agents shall erase or cause to be erased all Confidential Information from any computer memory or storage.

4. <u>Compelled Disclosures.</u> In the event that Receiving Party or any of its Agents are requested by subpoena, order, or in any other manner by any Person to disclose any Confidential Information, Receiving Party will give the Disclosing Party prompt notice of such request to enable Disclosing Party to seek an appropriate protective order or assurances of confidential treatment by the Person seeking disclosure. If Receiving Party or any of its Agents is still compelled by legal process to disclose any of the Confidential Information, Receiving Party may make such disclosure without liability to Disclosing Party, *provided,however*, that (a) Receiving Party has provided notice to the Disclosing Party as required above and that (b) Receiving Party cooperates as reasonably requested by the Disclosing Party in seeking to obtain a protective order or assurance of confidential treatment by the Person seeking disclosure.

5. <u>Miscellaneous.</u>

    a. <u>Indemnity.</u> To the fullest extent permitted by law, each party shall indemnify, defend, reimburse, and hold harmless the other party and its successors, assigns and their respective Agents from any and all allegations, claims, liens, liabilities, losses, demands, damages, expenses, suits, actions, proceedings, judgments, and costs of any kind whatsoever, whether actual or merely alleged and whether directly incurred or from a third party, including, without limitation, settlement costs, court costs, and attorneys'

and expert witness fees and expenses, arising out of, or relating to any such party's disclosure of the Confidential Information.

b. <u>Assignment</u>.   This Agreement is binding on and for the benefit of the parties and the parties' heirs, legal representatives, successors and permitted assigns.  No party may assign this Agreement, in whole or in part, voluntarily or involuntarily (including a transfer to a receiver or bankruptcy estate) without the prior written permission of the other party.

c. <u>No License</u>.   Nothing contained herein shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information disclosed by either party.

d. <u>Governing Law; Venue</u>.  This Agreement shall be governed in all respects by the substantive laws of the State of Oregon.   Receiving Party consents to jurisdiction and venue in any state or federal court located in Multnomah County, Oregon for any proceeding relating to this Agreement.

e. <u>Remedies</u>.  The parties acknowledge that any use or disclosure of Confidential Information in violation of this Agreement is likely to cause the other party irreparable harm for which money damages will not be adequate.  Therefore, if a party or any of its Agents breaches or threatens to breach this Agreement, the other party shall be entitled to equitable remedies, including injunctive relief and/or specific performance, without proof of money damages.  Each party waives any requirement that the other party post a bond or other security in order to obtain equitable relief.   Seeking equitable relief shall not prevent a party from also obtaining money damages for the same breach.   All remedies shall be cumulative.  In the event of any litigation (including appeals) under or in connection with this Agreement, the prevailing party will be entitled to recover its attorney fees and costs (including expert witness expenses) from the losing party.

f. <u>Term; Survival</u>.  This Agreement shall govern all communications between the parties that are made during the period from the effective date of this Agreement to the date on which one party receives from the other party written notice that subsequent communications shall not be so governed.      However, the obligations to protect Confidential Information disclosed to the Receiving Party during such period shall survive the termination of this Agreement and shall continue indefinitely.

g. <u>Severability</u>.   If any provision of this Agreement is held invalid, illegal or unenforceable by a court of competent jurisdiction, such holding will not affect the validity of any other provision of this Agreement.

h. <u>Modification; Waiver</u>.  This Agreement may not be modified or discharged, in any part, and no provision here may be waived, except when done in writing.  No waiver of a provision on a particular occasion shall affect the enforceability of such provision on subsequent occasions, and no waiver of any particular provision shall affect the enforceability of any other provision.  The failure of a party to enforce strict performance by the other party of any provision of this Agreement, or to exercise any right available to the party under this Agreement, shall not be construed as a waiver of its right to enforce strict performance in the same or any other instance.

i.  <u>Entire Agreement</u>.  This Agreement contains the entire agreement of the parties and matters addressed here, and it supersedes any prior agreement or understanding on such matters.

j.  <u>Representation on Authority of Signatories</u>. The individuals signing this Agreement represent and warrant that they are duly authorized and have the legal capacity to execute and deliver this Agreement on behalf of their respective parties. Each party represents and warrants that the execution and delivery of this Agreement and that party's obligations under this Agreement have been duly authorized and that the Agreement is a valid and legal agreement binding on each party and enforceable in accordance with its terms.

k.  <u>Notice</u>.  Except as otherwise provided in the Agreement, all notices or other communications under this Agreement must be in writing and delivered to the addresses below the signatures to this Agreement.  Such addresses may be changed by notice given by such party to the other pursuant to this section or by other form of notice agreed to by the parties.

The parties to this Agreement have executed this Agreement as of the Effective Date.

<u>LO3 Energy</u>

_____
Signature

Notice Address:
219 5th Ave. #5R
Brooklyn, NY 11215
E-mail:  ltorsini@lo3energy.com
Work:  (858) 344-5450

<u>Arthur Frederick Dudley</u>

_____
Signature

Notice Address:
67 e 2nd St. #39
New York, NY 10003
E-mail:  rick.dudley@consensys.net
Work:  (917) 215-9824

# EXHIBIT B

## MUTUAL NONDISCLOSURE AGREEMENT

THIS MUTUAL NONDISCLOSURE AGREEMENT (this "**Agreement**") is dated 14 June 2016 (the "**Effective Date**") by and between LO3 Energy Inc. and Adam Scislowicz.

### BACKGROUND

A.    LO3 Energy Inc.  and Adam Scislowicz desire to engage in discussions to examine certain potential mutually beneficial projects between them ("**Potential Projects**") or potentially an ongoing business relationship;

B.    In the course of such discussions each party (the "**Receiving Party**") may have access to or have disclosed to it Confidential Information (as defined in Section 1 below) of the other party (the "**Disclosing Party**"); and

C.    LO3 Energy Inc. and Adam Scislowicz each desire to establish and set forth their mutual obligations with respect to such Confidential Information.

### AGREEMENT

For good and valuable consideration acknowledged here, the parties agree as follows:

1.    Confidential Information.  For the purposes of this Agreement "**Confidential Information**" means all information which Receiving Party and any director, officer, employee, agent, affiliate, subsidiary, representative, consultant, member, contractor, advisor or attorney (each, an "**Agent**") receives at any time from the Disclosing Party or any of its Agents whether the information is received verbally, in writing, visually, by inspection of documents, products or processes, by electronic transmission, or in any other form or manner. All such information that is considered by both parties to be Confidential Information shall be clearly marked as such.  Information that is disclosed verbally shall be considered Confidential information if within sixty (60) days of initial disclosure, the Disclosing Party confirms in writing delivered to the Receiving Party the confidential nature of such verbally disclosed information. Such writing shall be sufficiently specific to enable the Receiving Party to identify the information the Disclosing Party considers to be confidential. Confidential Information also includes the following:   (a) all data (including, but not limited to, critical infrastructure information); (b) materials; (c) products; (d) client or customer information; (e) business plans; (f) compilations; (g) evaluations; (h) analyses; (i) financial information; (j) software programs or databases; (k) technical, administrative or marketing know-how; (l) services or pricing estimates, quotations or similar information; or (m) other information developed or prepared by the Disclosing Party or its Agents.  *However*, information that (w) becomes generally available to the public other than as a result of disclosure by the Receiving Party or by the Receiving Party's representatives, (x) was available to the Receiving Party on a non-confidential basis prior to its disclosure to the Receiving Party by the Disclosing Party or its Agents, (y) becomes available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party or its Agents when such source is entitled, to the best of the Receiving Party's knowledge, to make disclosure to the Receiving Party, or (z) was developed by the Receiving Party or its Agents independently without reference to or the benefit of the Disclosing Party's Confidential Information disclosed under this Agreement, is not Confidential Information

2. <u>Nondisclosure</u>. Receiving Party agrees to retain all Confidential Information and not to disclose any such information to any individual, group of individuals, partnership, corporation, limited liability company or other entity, public or private, including governmental bodies (each, a "**Person**") and not to use any such information for (a) its own benefit or (b) to the Disclosing Party's detriment or for any purpose other than the purpose recited above. The Receiving Party further agrees that it shall not publish or disclose any Confidential Information to any third party and that it shall use its best efforts to prevent inadvertent disclosure of such Confidential Information to any third party. The Receiving Party agrees to use the same degree of care to protect the Confidential Information as it uses to protect its own confidential and proprietary information, but in no event less than a reasonable degree of care. Notwithstanding the provisions above, Receiving Party may disclose Confidential Information to its Agents only to the limited extent necessary to explore, establish, develop and/or maintain the Potential Projects, the business relationship or proposed business relationship with the Disclosing Party, *provided, however*, that: (x) Receiving Party shall deliver a copy of this Agreement to each Agent before any Confidential Information is disclosed to such Agent; (y) Receiving Party shall require each such Agent acknowledge that it, he or she has (1) read this Agreement and (2) agrees to maintain the disclosed information in confidence or the Receiving Party certifies in writing to the Disclosing Party that such Agents have previously agreed by contract, as a condition to employment or in order to obtain the Confidential Information, to be bound by terms and conditions substantially similar to those of this Agreement; and (z) Receiving Party shall be fully responsible for any use or disclosure of Confidential Information by any of its Agents in violation of this Agreement.

3. <u>No</u> <u>Copying; Return</u>. Receiving Party and any of its Agents shall not copy any Confidential Information without the prior written consent of the Disclosing Party. Upon request of the Disclosing Party, Receiving Party and its Agents shall immediately return to the Disclosing Party all documents, notes and other materials, including all copies thereof, constituting or containing any Confidential Information. In addition, upon request of the Disclosing Party, Receiving Party and its Agents shall erase or cause to be erased all Confidential Information from any computer memory or storage.

4. <u>Compelled</u> <u>Disclosures</u>. In the event that Receiving Party or any of its Agents are requested by subpoena, order, or in any other manner by any Person to disclose any Confidential Information, Receiving Party will give the Disclosing Party prompt notice of such request to enable Disclosing Party to seek an appropriate protective order or assurances of confidential treatment by the Person seeking disclosure. If Receiving Party or any of its Agents is still compelled by legal process to disclose any of the Confidential Information, Receiving Party may make such disclosure without liability to Disclosing Party, *provided,however*, that (a) Receiving Party has provided notice to the Disclosing Party as required above and that (b) Receiving Party cooperates as reasonably requested by the Disclosing Party in seeking to obtain a protective order or assurance of confidential treatment by the Person seeking disclosure.

5. <u>Miscellaneous</u>.

a. <u>Indemnity</u>. To the fullest extent permitted by law, each party shall indemnify, defend, reimburse, and hold harmless the other party and its successors, assigns and their respective Agents from any and all allegations, claims, liens, liabilities, losses, demands, damages, expenses, suits,

actions, proceedings, judgments, and costs of any kind whatsoever, whether actual or merely alleged and whether directly incurred or from a third party, including, without limitation, settlement costs, court costs, and attorneys' and expert witness fees and expenses, arising out of, or relating to any such party's disclosure of the Confidential Information.

b.  Assignment.  This Agreement is binding on and for the benefit of the parties and the parties' heirs, legal representatives, successors and permitted assigns.  No party may assign this Agreement, in whole or in part, voluntarily or involuntarily (including a transfer to a receiver or bankruptcy estate) without the prior written permission of the other party.

c.  No License.  Nothing contained herein shall be construed as granting or conferring any rights by license or otherwise in any Confidential Information disclosed by either party.

A.

d.  Governing Law; Venue.  This Agreement shall be governed in all respects by the substantive laws of the State of Oregon.  Receiving Party consents to jurisdiction and venue in any state or federal court located in Multnomah County, Oregon for any proceeding relating to this Agreement.

e.  Remedies.  The parties acknowledge that any use or disclosure of Confidential Information in violation of this Agreement is likely to cause the other party irreparable harm for which money damages will not be adequate.  Therefore, if a party or any of its Agents breaches or threatens to breach this Agreement, the other party shall be entitled to equitable remedies, including injunctive relief and/or specific performance, without proof of money damages.  Each party waives any requirement that the other party post a bond or other security in order to obtain equitable relief. Seeking equitable relief shall not prevent a party from also obtaining money damages for the same breach.  All remedies shall be cumulative.  In the event of any litigation (including appeals) under or in connection with this Agreement, the prevailing party will be entitled to recover its attorney fees and costs (including expert witness expenses) from the losing party.

f.  Term; Survival.  This Agreement shall govern all communications between the parties that are made during the period from the effective date of this Agreement to the date on which one party receives from the other party written notice that subsequent communications shall not be so governed.  However, the obligations to protect Confidential Information disclosed to the Receiving Party during such period shall survive the termination of this Agreement and shall continue indefinitely.

g.  Severability.  If any provision of this Agreement is held invalid, illegal or unenforceable by a court of competent jurisdiction, such holding will not affect the validity of any other provision of this Agreement.

h.  Modification; Waiver.  This Agreement may not be modified or discharged, in any part, and no provision here may be waived, except when done in writing.  No waiver of a provision on a particular occasion shall affect the enforceability of such provision on subsequent occasions, and no waiver of any particular provision shall affect the enforceability of any other provision. The failure of a party to enforce strict performance by the other party of any provision of this Agreement, or to

exercise any right available to the party under this Agreement, shall not be construed as a waiver of its right to enforce strict performance in the same or any other instance.

     i.   <u>Entire</u> <u>Agreement</u>. This Agreement contains the entire agreement of the parties and matters addressed here, and it supersedes any prior agreement or understanding on such matters.

     j.   <u>Representation</u> <u>on</u> <u>Authority</u> <u>of</u> <u>Signatories</u>. The individuals signing this Agreement represent and warrant that they are duly authorized and have the legal capacity to execute and deliver this Agreement on behalf of their respective parties. Each party represents and warrants that the execution and delivery of this Agreement and that party's obligations under this Agreement have been duly authorized and that the Agreement is a valid and legal agreement binding on each party and enforceable in accordance with its terms.

     k.   <u>Notice</u>.   Except as otherwise provided in the Agreement, all notices or other communications under this Agreement must be in writing and delivered to the addresses below the signatures to this Agreement.  Such addresses may be changed by notice given by such party to the other pursuant to this section or by other form of notice agreed to by the parties.

The parties to this Agreement have executed this Agreement as of the Effective Date.

Lawrence Orsini

_____
Signature


Notice Address:
219 5th Ave. Ste 5R
Brooklyn, NY 11215
E-mail: ltorsini@lo3energy.com
Phone: (858) 344-5450

Adam Scislowicz

_____
Signature


Notice Address:
5360 Toscana Way Unit G111
San Diego, CA 92122
E-mail: adam@vulcanize.io
Phone: (650) 388-6224

# EXHIBIT C

## CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement ("Agreement") is between LO3 Energy, ("Client") and Vulcanize, Inc., a Delaware corporation ("Contractor").

### RECITALS

A.      Client builds tools and develops projects to support and accelerate proliferation of the distributed energy, utilities and computation sharing economy of the future. Client's team excels at the ideation, architecture, development, prototyping and testing of cutting edge distributed energy, computing and peer-to-peer distributed consensus networks for its customers ("Customers").

B.      Client wishes to retain Contractor to create a Proof of Concept / Proof of Stake based smart contract executing network to run on proprietary hardware provided by Client (the "Work"), that is described in more detail in the Scope of Work ("SOW") attached to this Agreement.

### AGREEMENT

In consideration of the promises the parties have made to one another, they agree as follows:

1.  Scope of Work.  Contractor agrees, subject to the following terms and conditions, to perform the Work identified in the SOW.

2.  Effective Date.  This Agreement shall become effective August 18, 2016.

3.  Terms of Payment; Expenses.  Client agrees to pay for Contractor's Work according to the compensation schedule in the SOW.  All monetary compensation shall be remitted in United States Dollars.

4.  Incorporation of Standard Terms and Conditions and SOW.  This Agreement consists of this one-page agreement, the Standard Terms and Conditions, and the SOW.  These last two documents are incorporated by this reference and made a part of this Agreement.  If any terms in the Standard Terms and Conditions conflict with terms in the SOW, the SOW will control.

5.  Notices.  Any notices pertaining to this Agreement or the Work performed under this Agreement shall be in writing, shall be sent via hand delivery, nationally recognized overnight courier service, certified or registered mail, or electronic mail, shall be effective upon receipt, and shall be addressed as set forth in the SOW.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the effective date set forth on the first page of this Agreement.

|  CLIENT  |  CONTRACTOR  |
| --- | --- |
| LO3 Energy | Vulcanize, Inc. |
| By:_____ | By:_____ |
| Lawrence Orsini, CEO | Rick Dudley, CEO |

1 of 8

DET 1737348

## STANDARD TERMS AND CONDITIONS

1.  Term of Agreement; Termination.  The term of this Agreement shall begin as of the Effective Date specified on the first page of this Agreement and shall continue to the date as set forth in the SOW, except that such term shall continue until Client receives all Deliverables (as defined in Section 3) from Contractor in connection with the Work, and Client pays Contractor the full consideration to be paid under this Agreement.  Either party may terminate this Agreement immediately for cause, if the complaining party first notifies the other party in writing and allows a reasonable opportunity, not to exceed ten days, for cure.  Client shall compensate Contractor for Work completed according to the terms and conditions of this Agreement through the effective date of termination.

2.  Independent Contractor.   The relationship created by this Agreement is that of independent contractors and nothing in this Agreement shall be construed as constituting Contractor an employee or agent of Client for any purpose.  In addition, this Agreement shall not be construed as creating any employment relationship, partnership or joint venture between Contractor and Client.  Contractor shall abide by the policies, rules, regulations or working requirements reasonably established by Client and shall carry out and complete the Work in the manner reasonably specified by Client.  Contractor shall be responsible for all life, health or disability insurance; federal, state or local withholding taxes; unemployment insurance benefits; social security; worker's compensation and similar expenses and/or deductions based on performance of the Work for Client.

3.  Deliverables; Delivery.  As described in detail in the SOW, Contractor shall prepare and periodically deliver to Client certain reports, analyses, models, pictorial diagrams, charts, etc., either in tangible or digital form (collectively "Deliverables").  Subject to the provisions of Sections 6 and 7 below and the provisions of the SOW, all Deliverables and all related documents, whether tangible or digital, as prepared by Contractor under this Agreement shall become the property of Client or Contractor as more fully described in the SOW.  Delivery under this Agreement means delivery to the Client's authorized contact or delivery location as identified in the SOW.  Client may: (i) replace its authorized contact, (ii) cancel or reschedule the delivery date, or (iii) change the delivery location upon reasonable prior notice to Contractor.  Deliverables will be delivered as specified in the SOW.  If Contractor cannot comply with a delivery commitment, Contractor will promptly notify Client in writing of a revised delivery date.  If this happens, Client may take such reasonable steps in law or equity to protect its business, but will use its best efforts to work with Contractor to achieve a fair result.

4.  Liability.  Contractor agrees to indemnify and to hold Client harmless:  (i) from any actual damages suffered by Client arising out of Contractor's performance under this Agreement and, (ii) for any injuries to persons or property caused by the acts or omissions of Contractor while performing Work under this Agreement; except that Contractor's indemnity shall be limited to its comparative fault.  Client's liability to Contractor for damages, if any, shall be limited to actual damages and shall not exceed the amount then owed by Client to Contractor for Work performed by Contractor under the terms of this Agreement. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES, LOST PROFITS, OR FOR ANY CLAIM OR DEMAND MADE BY ANY THIRD PARTY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The provisions of this Section 4 shall survive the termination of this Agreement or the completion of Work under this Agreement.

5.  Confidentiality; Proprietary Rights.  (a) As used in this Agreement, "Confidential Information" means any confidential or proprietary information identified in writing as confidential or proprietary that is disclosed by Client to Contractor during the term of this Agreement, whether of a technical, business, or other nature (including, without limitation, writings, trade secrets, know-how and information relating to technology, business plans, promotional and marketing activities, finances and other business affairs of

DET 1737348

Client). Confidential Information will be marked as such and may be contained in tangible materials, such as writings, drawings, models, data, specifications, reports, compilations and computer applications. Confidential Information shall not be: (i) information already known to Contractor, (ii) information in, or that becomes in, the public domain, or (iii) information acquired by Contractor from a third party entitled to disclose such information. Contractor agrees to maintain the confidentiality of information designated by Client as confidential during and after the term of this Agreement.

(b) Subject to the provisions of the SOW, all writings, software, analyses and related documentation created by Contractor pursuant to this Agreement shall become the property of Client and Contractor shall not copy or communicate any such documentation to any third party without the prior written consent of Client.

(c) Nothing in this Agreement shall be construed as granting, either expressly or by implication, estoppel or otherwise, any license to Client regarding any patent, trademark, copyright or other intellectual property now or later owned or controlled by Contractor. Subject to the provisions of the SOW, any materials, ideas or expressions developed by Contractor in any medium during the course of performing Work under this Agreement that relate to the Work or any invention, discovery or intellectual property owned or controlled by Client shall become the property of Client. The Contractor shall not retain any copies of the property owned by the Client without Client's prior written permission. Upon the expiration or earlier termination of this Agreement, or whenever requested by Client, the Contractor shall immediately deliver to the Company all such files, records, documents, specifications, information, and other items in its possession or under its control.

(d) The provisions of this Section 5 shall survive the termination of this Agreement or the completion of Work under this Agreement.

6. Copyrights. (a) Subject to the provisions of the SOW, Contractor agrees that all rights and title to Client Deliverables under this Agreement whether in written form, pictorial or other documentary or reproducible form, and in any medium whatsoever, belong exclusively to Client and shall be considered works made for hire. Any and all copyrights in and to such Client Deliverables are and shall be the sole property of Client. Subject to the provisions of the SOW, Client agrees that all rights and title to Contractor Deliverables (as defined in the SOW) under this Agreement, whether in written form, pictorial or other documentary or reproducible form, and in any medium whatsoever, belong exclusively to Contractor.. Contractor agrees to execute all documents reasonably requested by Client and to render, at Client's sole expense, whatever reasonable assistance Client may request to enable Client to perfect its ownership interest in and to such copyrights whether in the United States of America, its territories and possessions, or elsewhere in the world.

(b) Contractor agrees that Client would be irreparably harmed by Contractor's breach of this Section or Sections 5 or 7.

(c) The provisions of this Section shall survive the termination of this Agreement or the completion of Work under this Agreement.

7. Patents. To the extent that any Client Deliverable described in the SOW may be patentable and if permitted by the provisions of the SOW, Client may take such steps as it deems reasonably appropriate, at its expense, to file and prosecute any applications for patents in the United States and elsewhere, and the Contractor shall, on request, assign to Client any such applications and any patents resulting from them. Contractor shall take all such further steps as Client reasonably may request to perfect Client's sole and exclusive ownership of the Client Deliverable to the extent any such ownership is provided for in

the SOW. The provisions of this Section 7 shall survive the termination of this Agreement or the completion of Work under this Agreement.

8. Warranties. Contractor makes the following ongoing representations and warranties as may be applicable to the Work: (i) it has the right and authorization to enter into this Agreement and its performance of this Agreement will not violate the terms of any contract, obligation, law, regulation or ordinance to which it is subject; (ii) no claim, lien, or action exists or is threatened against Contractor that would interfere with Client's rights under this Agreement; (iii) Client Deliverables are free from defects in design (except for written designs provided by Client unless such designs are based entirely on Contractor's specifications), material and workmanship and will conform to the warranties, specifications and requirements in this Agreement for one year from the date of acceptance; (iv) Client Deliverables are safe for any use consistent with the warranties, specifications and requirements in this Agreement; (v) Work performed by Contractor will be of reasonable professional standards and quality and will comply with all applicable laws; (vi) Client Deliverables will be tested for, and will not contain, harmful code; (viii) Client Deliverables and Work do not infringe any privacy, publicity, reputation or intellectual property right of a third party; and (ix) all authors have agreed not to assert their moral rights (personal rights associated with authorship of a work under applicable law) in the Client Deliverables, to the extent permitted by law. If Client Deliverables or Work does not comply with the warranties in this Agreement, Contractor will repair or replace Client Deliverables or re-perform Work, without charge and in a timely manner. The provisions of this Section 8 shall survive the termination of this Agreement or the completion of Work under this Agreement.

9. Entire Agreement; Modification; Severability Each party acknowledges that it has not been induced to enter into this Agreement by any representations or statements, oral or written, not expressly contained in this Agreement or expressly incorporated by reference. Neither party may assign its rights or delegate its obligations under this Agreement without the other party's prior written consent, except to the surviving entity in a merger or consolidation in which it participates or to a purchaser of all or substantially all of its assets, so long as such surviving entity or purchaser shall expressly assume in writing the performance of all of the terms of this Agreement. All rights and obligations of the parties are personal to them. This Agreement is not intended to benefit, nor shall it be deemed to give rise to, any rights in any third party. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws principles. Any litigation relating to this Agreement shall be conducted exclusively in state or federal courts in New York, New York, and the parties consent to jurisdiction by such courts. The prevailing party in any proceeding (including, without limitation, arbitration or litigation) shall be entitled to recover all reasonable expenses of the proceeding or any appeal, including attorneys' fees. A party's failure to require performance by the other party of any provision of this Agreement shall not affect the right to require full performance at any later time, nor shall the waiver by either party of a breach of any provision of this Agreement be taken or held to be a waiver of the provision itself. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, such provision shall be changed and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law and the remaining provisions of this Agreement shall remain in full force and effect. This Agreement constitutes the entire agreement between the parties with respect to its subject matter. Any amendments must be in writing and executed by the party against whom such provision is to be enforced. This Agreement may be executed in two or more counterparts, each of which constitutes an original, but all of which together constitute one and the same instrument.

DET 1737348

# STATEMENT OF WORK
# ("SOW")

**Contractor:**    Vulcanize, Inc.

**Client:**    LO3 Energy

**Location of Project:** Work to be performed remotely.

**Delivery Location:**    Private Git Repository selected provided by Vulcanize.

**Effective Date**:    August 18, 2016

**Goal:**    To create a Proof of Concept ("POC") Proof of Stake ("POS") based smart contract executing network ("Blockchain") to run on proprietary hardware provided by Client ("Client Hardware"). Nodes on the Blockchain will be connected to the same electrical grid and to a private IP network for demonstration purposes.

**Work:**

    **A.**    The demonstration version of the Client's electrical grid has been divided into three sections:
        1. Contractor will be exclusively developing the Blockchain.
        2. Contractor will collaborate with another team on the Device Control.
        3. Contractor will collaborate with another team on the Frontend.

    **B.**    Contractor will:
        1. Integrate an existing suite of contracts that generate the tokens via the Client Hardware.
        2. Provide the testing and tooling (Jenkins, etc.) for the other developer teams.
        3. Provide general support (e.g. API discussion) to frontend team.
        4. Discuss specifications with hardware team.

    **C.**    Contractor is responsible for delivering the Blockchain component with these features:
        1. POS Ethereum Virtual Machine ("EVM") network for transacting tokens.
        2. Marketplace for buying and selling tokens.
        3. Payment Oracles.
            a. For prosumers
                i. Generate bill
                    1. Website facilitates secure transfer of consumer contact information to oracle.
                    2. Calculate amount owed by querying the Blockchain.
                        i. Sign and store bill
                        ii. Send notification:
                    3.   Oracle sends text to consumers.
                    4.   Oracle sends email to consumers.

5 of 8

          b.  For consumers
              i.  Payment due notices:
                  1.  User provides information/preferences via website to be consumed by prosumer oracle.

**D.**    Contractor will work with the hardware team to develop:
      1.  Smart contract Device Control.
      2.  Oracle-based Device Control.

**Timeline:**

| WORK DAYS TO COMPLETE | WORK DAYS FROM START | Blockchain & Systems (Vulcanize Develops) | Middleware & Integration (Vulcanize) | Front-End |
|---|---|---|---|---|
| 3 | 3 | Simple POS Blockchain & EVM | Development Environment Github / Jenkins | |
| 5 | 8 | Smart Contracts POC | Development Environment Code review system | |
| 5 | 13 | Minimal Scaffolding: Control Logic to expose HTTP REST API to the Middleware. | Node.js DB | |
| 5 | 18 | SYNC POINT 1 HTTP REST API | SYNC POINT HTTP REST / DB API | SYNC POINT HTTP REST / DB API |
| 3 | 21 | Add notifications to control layer | | Minimal Front-end POC |
| 5 | 26 | SYNC POINT 2 Notification Layer | SYNC POINT Notification Layer | Generate Bill |
| 4 | 30 | Harden Control layer | Text Message Gateway | Sign & Store Bill |
| 5 | 35 | Harden Smart Contracts | Email Gateway | Harden WebUI |
| 3 | 38 | | Harden Notification Layer | Notifications Integration |

DET 1737348

| 10 | 48 | SYNC POINT 3<br>System Testing | SYNC POINT<br>System Testing | SYNC<br>POINT<br>System<br>Testing |
|----|----|----|----|----|
| 10 | 58 | SYNC POINT 4<br>Meet Acceptance Criteria | SYNC POINT<br>Meet Acceptance<br>Criteria | SYNC<br>POINT<br>Meet<br>Acceptance<br>Criteria |

**Completion Date**:    58 Work Days after Effective Date. A "Work Day" is any day other than a Saturday, Sunday or any other days on which banks are not open for business in New York City.

**Deliverables:**    Contractor will deliver the software and tools, perform the testing and provide the support described in Work paragraphs B, C and D above. Deliverables for the week will be provided upon payment.

**Ownership;
  License:**    Notwithstanding anything to the contrary contained in this Agreement, including the Standard Terms and Conditions:

1. The Deliverables described in SOW paragraphs C.2 and C.3 ("Contractor Deliverables") shall not be considered works for hire and shall be the property of Contractor. Any and all copyrights in and to the Contractor Deliverables shall be the sole property of Contractor. All writings, software, analyses and related documentation created by Contractor in connection with the Contractor Deliverables shall become the property of Contractor. Any materials, ideas or expressions developed by Contractor in any medium during the course of performing Work under this Agreement that relates to the Contractor Deliverables shall become the property of Contractor. To the extent that any Contractor Deliverable may be patentable, Contractor may take such steps as it deems reasonably appropriate, at its expense, to file and prosecute any applications for such patents. Contractor grants to Client a fully paid up license to use, sell and sublicense the Contractor Deliverables in the energy sector (the "Field"). Contractor shall not use, or sell or license to others the Contractor Deliverables in the Field, but shall be free to use, sell or license the Contractor Deliverables to any entity outside the Field.

2. The Deliverables described in SOW paragraphs B.1, B.2, B.3, B.4, D.1 and D.2 ("Client Deliverables") shall be considered works for hire and shall be the property of Client. Any and all copyrights in and to the Client Deliverables shall be the sole property of Client. All writings, software, analyses and related documentation created by Contractor in connection with the Client Deliverables shall become the property of Client. Any materials, ideas or expressions developed by Contractor in any medium during the course of performing Work under this Agreement that relates exclusively to the Client Deliverables shall become the property of Client. To the extent that any Client Deliverable may be patentable, Client may take such steps as it deems reasonably appropriate, at its expense, to file and prosecute any applications for such patents.

DET 1737348

**Compensation**:   The project cost is estimated at $69,600. A $5,000 retainer will be paid on the Effective Date. The hourly rate is $150. Hours will be reported weekly and payments made to maintain a retainer balance of $5,000, at the start of each work week. Work resumes when the full retainer of $5000 for the week is received. Meetings, regardless of medium, will be billed hourly per resource involved.

**Notices:**   Any notices shall be sent to the following addresses:

Contractor

Vulcanize, Inc.
244 5th Avenue, Suite D281
New York, New York 10001
Email: rick@vulcanize.io

Client

LO3 Energy
621 Degraw
Brooklyn, New York 11215
Email: ltorsini@lo3energy.com

IN WITNESS WHEREOF, the parties have executed this Agreement as of the effective date set forth on the first page of this Agreement.

| CLIENT | CONTRACTOR |
|--------|------------|
| LO3 Energy | Vulcanize, Inc. |
| By:_____ | By:_____ |
| Lawrence Orsini, CEO | Rick Dudley, CEO |

DET 1737348

## Amendment to Contract

1. This amendment (the "Amendment") is made by LO3 Energy Inc. and Vulcanize Inc., parties to the Consulting Services Agreement dated August 18, 2016 (the "Agreement").

2. The Agreement is amended as follows:

    1. **Compensation:** Amend the original estimated budget from "$69,600" to "$93,000" as a result of adding additional features to the Scope of Work

    2. **Scope of Work:** The Statement of Work is amended to add the following tasks as Section E. Siemens Integration:

- Gateway Command Line Configuration
- Setup Siemens' Virtual Private Network
  Support Siemens' Virtual Private Network Configuration
- Node to Gateway Emitter
  Gateway Aggregator
- Aggregator to Siemens' Serialization Channel
- QA and Acceptance Testing

3. Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is conflict between this amendment and the Agreement or any earlier amendment, the terms of this amendment will prevail.

By: _____

Printed Name: Lawrence Orsini

Title: CEO

Dated: 2/21/17

By: _____

Printed Name: _____

Title: _____

Dated: _____